**GULF OIL CORPORATION et al. v. AMAZON PETROLEUM CORPORATION et al.**

**No. 5782.**

Court of Civil Appeals of Texas. Texarkana.

May 29, 1941.

Rehearing Denied June 19, 1941.

Thompson, Knight, Harris, Wright & Weisberg and Dwight L. Simmons, all of Dallas, Brachfield & Wolfe, of Henderson, and John E. Green, Jr., Wm. Stone Wells, B. C. Clark, H. H. Jennings, and Joe S. Brown, all of Houston, for appellants.

Machen, Chancellor & Wood, of Dallas, Slay & Simon and Gerald W. Greathouse, all of Fort Worth, and R. B. Stephen, of Henderson, for appellees.

HALL, Justice.

In 1934 appellee Amazon Petroleum Corporation instituted this suit in form of trespass to try title against appellants G. H. Vaughan, Gulf Oil Corporation, and numerous parties not necessary to mention, to recover the leasehold on a strip of land containing about 8.3 acres, a part of Block 4 of the East half of the F. Cordova Survey in Rusk County, Texas. Later by amended pleadings appellant G. H. Vaughan Production Company and appellees H. E. Turner and wife, and their three children, were made parties. Appellee J. Lane Wilson became a party by intervention. As originally aligned in the court below, appellants were defendants and appellees were plaintiffs and intervenor. At the time of the trial, however, appellants were cross plaintiffs and appellees were cross defendants, but the case retained its identity as one in trespass to try title with the usual pleadings incident thereto. And in addition appellees pleaded the 10 years' statute of limitation. While the pleadings reflect that the claim of appellant Gulf Oil Corporation was antagonistic to that of appellants G. H. Vaughan and Vaughan Production Company, the facts reveal that their cause in both this court and in the court below was a common one. As said by appellees in their brief: "Although the Gulf alleged that it owned the property, and sued the Vaughans for title and possession, at the trial of the case, they strenuously sought to prove that they did not own the property, and that the Vaughans did own it."

The verdict of the jury was upon special issues. Both parties made motion for judgment. Appellees based their motion upon the verdict of the jury and appellants non obstante veredicto. Appellees' motion for judgment was granted and this appeal results.

Appellants G. H. Vaughan and Vaughan Production Company's first proposition is: "It appearing from the uncontroverted testimony in this case that neither the deed from Maxwell Brothers to Turner, conveying the south 52½ acres of the 152½ acre tract, nor the deed from Turner to Thrash, conveying the 152½ acre tract, call for the sweet gum relied upon by appellees as being located at the southwest corner of said tract, but that said deeds call to go south to the north line of the Beall tract and thence west to the west boundary line of the east one-half of the Cordova Survey, no witness trees; and there being no evidence to show that the original surveyor or surveyors who surveyed the 52½ acre tract and 152½ acre tract, as described in said deeds, reached the sweet gum tree in question, but on the contrary, it appearing from the calls in such deeds that they did not find any witness trees at said corner, the location on the ground of the sweet gum tree is wholly lacking in probative value as a means of locating the true north boundary line of Block No. 4 of the Wadsworth Subdivision of the east half of the Cordova Survey, and appellants having proven title to the strip in controversy, the Court erred in overruling

plaintiffs' motion for an instructed verdict."

Hereafter appellants G. H. Vaughan and Vaughan Production Company will be referred to as "the Vaughans", Gulf Oil Corporation as "Gulf", and appellees H. E. Turner and wife and their three children as the "Turners." The other parties involved herein will be referred to as in the record. The following map, we think, will be of assistance to a proper understanding of this case.

The land in controversy is represented on the map by the shaded portion ABXY. This disputed area is 207.5 feet wide at its west end and 174.4 feet wide at its east end. Its mean length is 1,832 feet and is divided into five equal parts alleged to be owned by the Turners. J. Lane Wilson holds the leasehold under the Turners covering the land in controversy. Admittedly the land lying north of line AB

and east of BXO belongs to H. C. Maxwell, and the land south of XY belongs to the estate of L. P. Thrash and wife, grantees of H. E. Turner. The Vaughans hold the leasehold on the north 40 acres of the 100-acre tract under an assignment emanating originally from Thrash and wife.

The 100-acre tract lying north of line EF purchased by H. E. Turner from Nannie Truitt in 1908 is described as follows:

"Beginning at the N.W. corner of said Block No. 4; Thence East 677 vrs to corner on Hickory 10 in dia marked thus 'X' on two sides;

"Thence South 833-⅓ vrs to corner on South line of the original Block from which a post oak 6 in dia brs. North 80 E 6 vrs; 1½ vrs on another 8 in dia brs North;

"Thence West 677 vrs to the South West corner of said Block No. 4;

"Thence North 833½ vrs to the place of beginning, containing one hundred acres of land."

Tract EFCD lying immediately south of and adjoining the 100-acre tract purchased in January, 1913, from W. W. Maxwell by H. E. Turner is described as follows:

"Beginning at H. E. Turner's SE corner same being the S. E. corner of the Frank Truitt old place and the southwest corner of I. M. Thrash's present home place and on the north line of the Gilliland place witness trees now dead;

"Thence South with same course as dividing line between I. R. Thrash and H. E. Turner 448 vrs to corner on North line of the South half of the Gilliland tract; the same being E. M. Beal's north line from which a pine 12 in in dia brs N 19 W 5½ vrs and a Sweet gum 6 inches in dia brs N 51 E 5½ vrs;

"Thence West with north line of same 666 vrs to the west line of the East half of the said league, no witness trees, marked.

"Thence North with the said line 448 vrs to the northwest corner of said block No. five corner being about three vrs north from small ravine and about three vrs SW from a large unmarked pine tree.

"Thence East with H. E. Turners south line 666 vrs to the place of beginning, containing 52.8 acres of land."

These two tracts of land were sold as one tract by H. E. Turner to L. P. Thrash

in December, 1928, and are described as follows:

"Beginning at the northwest corner of said Block No. four on the West line of the East half of said league;

"Thence East 677 vrs to corner on a hickory 10 in dia marked X on two sides.

"Thence South at 833⅓ vrs the Southeast corner of said 100 acre tract and the North East corner of 52.8 acre tract, and at 1281⅓ vrs to corner on North line of the South half of the Gilliland tract, same being the North line o– the E. M. Beal– tract, from which a pine 12″ in dia brs N 12 W 5½ vrs. and a Sweet gum 6 in diam brs N 51 E 5½ vrs;

"Thence West with the north line of said tract 666 vrs to the West line of the East half of said league, no witness trees;

"Thence North with said line, at 448 vrs the Northwest corner of said 52.8 acre tract and the Southwest corner of said 100 acre tract and at 1281⅓ vrs to the place of beginning, containing 152.8 acres of land, more or less."

The E. M. Bealle tract lies immediately south of EFCD, the 52-acre tract, and that part of its description material here is:

"Being a part of Block No. 5 of Cordova league headright survey of situated about 10 miles NW of Henderson and being a part of the Gilliland Homestead of said Blk and tract.

"Beginning at the SW cor of said Blk & Tract a walnut 24 inches dia brs South 2 vrs;

"Thence North with *W*BL of same 479 vrs to cor a S. gum 8′ dia brs N 81½ E 4½ vrs."

■ It is the contention of appellees that a large sweet gum tree found at the Northwest corner of the Bealle tract, shown on the map, is controlling and fixes the Southwest corner of the 152.8-acre tract sold by Turner to Thrash, since the two corners are coexistent. And, this being the only established corner of the 152.5-acre tract, its field notes should be constructed from this known corner by course and distance. Appellants contend that the sweet gum witness tree located at Bealle's Northwest corner, not being called for in the description of the 152.5-acre tract, owned by Turner and sold by him to Thrash, is "wholly lacking in probative value as a means of locating the true north boundary line of Block No. 4," or the north boundary line of the 152.5-acre tract. It is admitted that at the time of the trial and at the time the various surveys were made of this land by the several engineers who testified in this case, all the witness trees called for in the field notes to both the 100-acre tract and the 52.5-acre tract were gone. There is no contention by any one that the sweet gum tree at the Northwest corner of the Bealle tract is called for in the field note description of either the 52.5-acre tract, EFCD, or the 152.5-acre tract. This being true, it would have no probative value in establishing the Southwest corner of these tracts, unless it is "identified by the surveyor who made the survey, or by any other witness who was present with him at the time, as having been so placed to mark his footsteps." Gill v. Peterson, 126 Tex. 216, 86 S.W.2d 629, 631, and authorities there cited. No such identification was made in the case. No one testified that the surveyor who surveyed line CD located or called for the sweet gum witness tree marking Bealle's Northwest corner. Moreover, it affirmatively appears from the call for the south line, CD, "Thence West with the North line of same (Bealle's N. line) 666 vrs. to the West line of the East ½ of said League, no witness trees," that the surveyor who ran that line did not locate the marked sweet gum as a witness tree for the southwest corner D. It is our opinion that the sweet gum witness tree is without probative value in establishing the boundary lines of either the 100-acre tract or the 152.5-acre tract.

The facts are undisputed that in 1916 or 1917 H. C. Maxwell and H. E. Turner built partnership fences along the line AB and from B to O, the Arp-Henderson road. The east half of the fence from A to B was constructed by Maxwell and the west half of same was built by Turner. They did not work together in constructing the fence, but did stake out the line together. The fence along the east line from B to O was built by Maxwell, Turner furnishing the posts. It was built from the road up north to Maxwell's other property lying north of the Turner tract. Concerning the construction and use of the north fence from A to B, H. E. Turner testified:

"Q. Building the North fence up there going East—excuse me—going West, would have been going toward your father's place? A. That is right.

"Q. Did your father at that time have a fence already built running North and South? A. He did.

"Q. Did you go on West until you came to that fence going West? A. Yes, I built the West end of it.

"Q. You built the West end of this fence between you and Mr. Maxwell? A. That is right.

"Q. And when you got through you were over to your father's fence? A. Yes, sir.

"Q. And tied on that? A. Yes, sir.

"Q. That was the Northwest corner of the place you bought from Truitt? A. The Northwest corner.

"Q. And back at the Northeast corner of the place you bought from Truitt was where you met the fence going North of a fence Maxwell had built? A. I didn't build to the corner, I built about half way up the North and East line.

"Q. And Mr. Maxwell's part of the building was to carry it the other half of the way? A. Yes, sir.

"Q. Over to the Northeast corner? A. Yes, sir.

"Q. And that was the corner of his land, he had land North of that corner and East of that corner? A. Yes, he commenced on his Northeast corner and built about half way.

"Q. Half way over toward your father's fence? A. Yes.

"Q. You say the Northeast corner; he had land North of that corner? A. Yes, it was where my corner joined.

"Q. Where your corner joined his land? A. Yes, sir.

"Q. From then on you and Mr. Maxwell used the two fences we have been talking about as your common line? A. We did.

"Q. And of course, after you built that fence the East fence running North and South, after you built the East fence over there you never worked any land to the East of it, on the East side of the fence? A. Not after we built the North and South line.

"Q. You never went on the East side of it and cut timber or plowed land over there? A. No, sir.

"Q. That was Mr. Maxwell's land? A. Yes.

"Q. And the same way on the other side, you never cultivated anything on the North side after you built the fence? A. No, sir.

"Q. That was Mr. Maxwell's land and your land was on the South of the fence? A. Yes, that is right.

"Q. He never came South of the fence and claimed any of that land? A. That is right.

"Q. And over on the East he never came on to your land on the West of it and claimed any of that? A. That is right.

"Q. You recognized the fences as the lines between you? A. We did."

Turner also testified that he sold this land to Thrash as one tract containing 152.5 acres in December, 1928, after which he moved to Arp—later to Tyler where he resided at the time of the trial; that he has not cultivated or used any land in that vicinity since he sold to Thrash. He also testified that Maxwell's south line and his north line were the same. Turner is silent as to any claim of limitation by him to the strip of land in controversy. However, Mrs. Turner does testify to such a claim after learning of the 8.3-acre excess in 1931. L. P. Thrash and wife are dead, and were at the time of the trial.

Maxwell testified that he and Turner had known each other for many years and had lived there in that community together. With respect to the construction of the east and north fences between his place and Turner's, Maxwell's testimony coincides with that of Turner. Concerning the location of the north fence between A and B, Maxwell testified:

"Q. How did you determine where to put the fence? A. We were going to build it on the line in there, the line trees were there to show us where to build the fence at.

"Q. Was there a marked line there at that time? A. Yes.

"Q. Did you and Mr. Turner build that fence according to that Marked line? A. According to that marked line; when we didn't have a line we built straight through right straight on the line, because I wanted to clear my land on the West side up to the line, we built the fence square on the marked line.

"Q. When you ran out of marks—A. We set stakes to follow from one mark to

the other, we didn't have a surveyor, we set stakes from one mark to the other. * * *

"Mr. Simmons: Mr. Maxwell, before either one of you started building, what, if anything, did the two of you do with reference to locating where the fence would be built? A. I wanted to fence my land, all I had in there, and we just agreed to make us a fence through there and rather than me to have to build it all, he wanted his enclosed, we agreed to build half way and he agreed to build half way, by having plain marked hacked trees through there. That is all we had to follow the fence.

"Q. Was there a hacked line every foot of the way through there or not? A. When there was trees close to the line, there, were some little skips where there would not be timber close enough, but there was enough we could track through.

"Q. When you came to the skips what did you and Mr. Turner do with reference to the skips? A. We had a stake to keep us in line, we set up stakes to go by.

"Q. Did a surveyor locate the stakes? A. No, sir.

"Q. Who did locate them? A. Me and Mr. Turner located them ourselves, me and him.

"Q. Did you after that build the fence along the line you just testified about? A. Yes, I built it half way from the East corner half way down the best we could step off, and he built through to the other side to his father's place.

"Q. When the fence was finished from one end to the other was it along the line and on the location as made by you and Mr. Turner? A. Yes.

"Q. Did it go from the Northeast corner of the Truitt place to the Northwest corner of Mr. G. G. Turner's fence? A. Yes, it went the full width through there.

"Q. When the fence was finished it was a continuous fence from the Northeast corner to the Northwest corner along at the location you and Mr. Turner had made? A. Yes.

"Q. Thereafter did you ever work or cultivate any land as your own South of that fence? A. None South of it, I cleared and cultivated North of it but nothing South of it.

"Q. Did you clear and cultivate North of it pretty well down to it? A. Every

tree on my side of the line I cut it out and cultivated it right down to the line.

"Q. When that fence was built what was the condition of the land with reference to whether it had timber on it, I mean South of the fence? A. There was timber all the way South, right up next to the fence all the way through on the South side part of the way and the extreme East corner I bought timber off that down to the fence later.

"Q. South of the fence? A. Yes.

"Q. On the Turner land? A. Yes, on the Turner land.

"Q. Bought it from Mr. Turner? A. Yes.

"Q. From what part of the Turner land was the saw timber? A. The saw timber was on the Northeast corner.

"Q. Did that saw timber run clear up to that fence? A. Yes."

Continuing, Maxwell testified:

"Q. When you and Mr. Turner were locating the fence along the North line, how did you know where to put the Northeast corner, how did you know where to stop? A. I knew by my corner, I had marked tree corners that I had always gone by from the time I went on the place up to then.

"Q. When was the first time you located the corner yourself? A. When I bought the place and went on it in 1903 was the first time I ever had an occasion to find it, and I found all of my corners at that time. * * *

"Mr. Simmons: Was the corner you have testified identified at the time Truitt owned it? A. Yes, when I went on the place there was a hacked plain corner where I had to stop with my line coming North and West.

"Q. Is that the corner as you saw it in 1903 and as the fence was built to it in 1916 the same place the corner is today on the ground? A. It would be the same corner but there is no witness where I had my corner, when I went South that is where I had to stop, both corners West and South came up to that and that is where my land came up to, plain hacked lines.

"Q. Two hacked lines intersected at that point? A. Two hacked lines intersected at that point and that is what I had to go by.

"Q. On the ground today is that fence where you and Mr. Turner located it? A. The fence has gone down since the oil field came in, my son-in-law has the West part of it fenced on the line but my part of it around to the road is done away with.

"Q. The fence is down now? A. Yes.

"Q. It is gone? A. Only a few of the fence posts there but no fence kept up.

"Q. Are they at the location made by you and Mr. Turner made in 1916 the old fence post? A. Yes.

"Q. Up until the days of the oil field were those two fences the North and East one maintained in the places at which they were originally located? A. Yes, and I cultivated the land up to it on the East up to the fence a little strip of woods on the West, but the fence was kept up."

On cross-examination Maxwell testified to witness trees at or near the corner marked B, his inner southeast and Turner's northeast corner, and to numerous bearing trees along the line AB. No witness in this case, not even H. E. Turner, contradicted the testimony of Maxwell with respect to the existence and location of the corner and bearing trees at B and between A and B at the time the north fence was constructed. Maxwell is not a party to this cause and has no interest in its outcome. His testimony seems to be more nearly against his interest.

 As indicated by Turner's and Maxwell's testimony, copied above, the fence A to B was built by them to separate their respective tracts of land. The evidence is conclusive that there was at the time of the trial an old fence corner at or near both A and B and the remains of an old fence between these points. It is undisputed that this fence stood in good repair until about 1930 or 1931 when oil was discovered in Rusk County and the fence was destroyed. This fence from A to B was built along a marked line which Maxwell testified was his south line and Turner's north line. It was recognized by both Turner and Maxwell, the interested parties, as marking the line between them. Both of them, Turner and Maxwell, recognized A as being Turner's northwest corner and Maxwell's southwest corner, and B as being Turner's northeast corner and Maxwell's inner southeast corner. This recognition and acquiescence began in 1916 or 1917, the date the fence was built, and

continued until December, 1928, when Turner sold the two tracts containing 152.5 acres as one tract to Thrash. And this fence continued to divide Maxwell's property on the north from Thrash's property on the south from 1928 until the fence was destroyed or torn down about 1930 or 1931. Such being the undisputed facts as shown by the testimony of both Turner and Maxwell set out in this opinion, the conclusive presumption arises that line AB was fixed by agreement between them, and on the date said land was sold by Turner to Thrash in December, 1928, said fence line by force of said presumption had become the established boundary line between their lands. Anderson v. Atlantic Producing Co., Tex.Civ.App., 83 S.W.2d 418, writ refused, and authorities there cited. In 11 C.J.S., Boundaries, 654, § 81, it is said: "Where recognition and acquiescence have continued for the period of time prescribed by statutes concerning acquiescence or for the period required by statutes of limitations for acquisition of title by adverse possession, the presumption that the line is in fact the true line or that there has been an agreement fixing it as the true line becomes conclusive, and the line as acquiesced in is conclusively established as the boundary."

And as stated in Anderson v. Atlantic Producing Co., supra (83 S.W.2d 419), "A line thus established will control and become the true boundary line of the land, even though it may not be established on the line called for in the deed." But should we be mistaken in the application of the above rule of law as applied to the facts of this case, still we think the evidence of Maxwell and Turner establishes conclusively that they constructed the division fence from A to B on a marked line believed by them to be the true line between their lands; that they recognized and acquiesced in said line so established continuously for at least eleven years—such a length of time as under the facts in this case ripens title to the land south of the line AB in Turner under the 10 years' statute of limitation Vernon's Ann.Civ.St Art. 5510. The location of this division line, it now develops, is uncertain, and from the maze of testimony of the several engineers who testified in this case, its proper location would be hard to ascertain. In either of such circumstances, that is, whether the agreement fixing line AB as the boundary line between Turner and

Maxwell is presumed or actually expressed by them, the rule of law announced in the case Tide Water Oil Co. v. Hale, Tex. Civ. App., 92 S.W.2d 1102, 1103, writ dismissed, is controlling and the call in the deed from Turner to Thrash and in the oil and gas lease and its assignments subsequently executed to begin "at the N. W. corner of said Block No. 4 of the West line of the East ½ of said League" would mean the northwest corner as established on the ground at point A by Turner and Maxwell when they constructed the fence from A to B in 1916 or 1917. Dow v. American Liberty Oil Co., Tex. Civ. App., 83 S.W.2d 401, and cases there cited. This being so, the oil and gas lease assignment to the north 40 acres of the 152.5-acre tract now held by the Vaughans would cover and include the strip of land in controversy.

The conclusions announced above render unnecessary a discussion of the other assignments brought forward by appellants.

■ Appellees present three propositions based upon cross assignment brought forward by them. Typical of these is No. 2, which is: "Where the appellants (plaintiffs in the trial court) attempted to prove title to the tract of land here in controversy by a purported chain of transfers from the Sovereignty of the Soil and five (5) links in said chain were statements of an abstractor as to information taken from an index record; said information did not contain the description of any land or survey of land and did not purport to convey the land here in controversy; and said statement having shown conflicting names of grantors and grantees as follows: S. Jones to E. Prescott, Samuel Jones to Eustis Prescott, E. Prescott to D. Ayres, David Ayres to J. M. Bullock; no presumption could be indulged that S. Jones and Samuel Jones were one and the same person, that E. Prescott and Eustis Prescott were one and the same person, that D. Ayres and David Ayres were one and the same person, and no presumption could be indulged that any of said parties ever owned or conveyed the land here in controversy or any land in the Cordova Survey and the appellants having wholly failed to prove title to said tract of land from the Sovereignty, the court erred in overruling appellees' motion for an instructed verdict."

It was stipulated in the record that the Rusk County courthouse burned March 5, 1878, and that "Volumes B, C, D, and E of the Deed Records were burned, covering the period from 1846 to 1851, but the Index to these records was preserved." And it was also stipulated and agreed "that all parties to this suit may read from abstracts, or original records as to the contents of any instrument that they desire to offer in evidence, subject to all other legal objections, and that the rule with reference to filing certified copies is waived." The five breaks in appellants' chain of title asserted by appellees have reference to the failure of appellants to produce in evidence the record of the complete transfers covering these five alleged breaks. It was established without controversy that the record of these transfers was contained in the Deed Records destroyed by the Rusk County courthouse fire in 1878, and their complete reproduction in evidence was impossible of accomplishment. The transfers were nearly 100 years old and it can hardly be presumed that any person now living can be found who would know of these transfers and testify as to their contents. The index reference to these instruments, as well as reference to them in other ancient deeds executed since, were admitted in evidence. There was no evidence offered to contradict these recitations and references. It seems to us that this evidence of the execution and existence of these destroyed records is all the evidence of which this phase of the case is susceptible. And although these references are hearsay, self-serving, and intrinsically weak, and, on that account if offered shortly after their execution would not be admissible, are, nevertheless, made admissible and materially strengthened in their probative force by the passing of over 90 years. Especially is this true when the lapse of time has silenced every other source of proof of their execution. In Boulware v. Kempner, 36 S.W.2d 527, 529, Judge Alexander, speaking for the Waco Court of Civil Appeals, stated: "The existence of the deed from the attorney in fact to A. H. Wier was necessary to establish appellee's chain of title to the land in question. The recitations in the above deed were hearsay and self-serving and ordinarily would not be admissible, and if standing alone, would not be sufficient to establish the existence of the missing conveyance. But where it is sought to establish the execution of deeds to land, the originals of which have been lost or destroyed without being re-

corded, the courts are very liberal in the admission of all the surrounding circumstances that would tend to establish the existence of such deeds. This is especially true where it is an ancient title paper, the existence of which is sought to be established. If this were not true, many honest titles would be defeated. Ordinarily the courts will admit evidence of all the surrounding circumstances, both before and after the date on which such lost instrument is supposed to have been executed for the purpose of determining the existence or nonexistence of such an instrument. In such a case, by reason of the law of necessity, the rule against self-serving declarations is relaxed, and such declarations, when they are themselves found in ancient documents, will be admitted as a circumstance to establish the existence of the lost instrument." (See authorities there cited).

These propositions are therefore overruled.

The judgment of the court below is reversed and here rendered for G. H. Vaughan and Vaughan Production Company and against appellees; and is affirmed as to the Gulf Oil Corporation.

Reversed and rendered in part, and in part affirmed.